UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TAYE ELLEBY,

                             Plaintiff,

v.                                               9:20-CV-0693
                                               (LEK/ML)

SGT. MARTINGANO,

                             Defendant.

_____

APPEARANCES:                           OF COUNSEL:

TAYE ELLEBY
  *Pro Se* Plaintiff
Cape Vincent Correctional Facility
Route 12E
P.O. Box 739
Cape Vincent, New York 13618

LETITIA A. JAMES                       CHRISTOPHER HUMMEL, ESQ.
Attorney General for the State of New York    Assistant Attorney General
  Counsel for Defendant
The Capitol
Albany, New York 12224

MIROSLAV LOVRIC, United States Magistrate Judge

## <u>REPORT-RECOMMENDATION</u>

      Currently before the Court, in this civil rights action filed by Taye Elleby ("Plaintiff")

against Sergeant Martingano ("Defendant"), is Defendant's motion for summary judgement

pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 33.)  For the reasons set forth below, I recommend that

Plaintiff's Complaint be dismissed and Defendant's motion for summary judgement be granted

in part.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Claims

Generally, liberally construed, Plaintiff's Complaint asserts that—pursuant to the Eighth Amendment and 42 U.S.C. § 1983—Defendant failed to protect him from gang violence when he was housed at Greene Correctional Facility ("Greene"). (*See generally* Dkt. Nos. 1, 10.) The Court's Decision and Order dated September 8, 2020, thoroughly outlines Plaintiff's allegations and claim. (Dkt. No. 10 at 8-9.)

### B.    Procedural History

On June 22, 2020, Plaintiff commenced this civil rights action by the filing of a Complaint dated June 17, 2020. (Dkt. No. 1.) On June 23, 2020, Senior United States District Judge Lawrence E. Kahn directed administrative closure of the action and ordered that within thirty days, Plaintiff must either (1) pay the filing fee in full, or (2) submit a completed and signed *in forma pauperis* ("IFP") application. (Dkt. No. 2.) On July 6, 2020, Plaintiff filed an application seeking leave to proceed IFP and the inmate authorization form that is required for actions in the United States District Court for the Northern District of New York. (Dkt. Nos. 3, 4.)

On July 31, 2020, Plaintiff filed a notice of change of address stating that he was transferred to Washington Correctional Facility ("Washington"). (Dkt. No. 7.)

On September 8, 2020, Judge Kahn issued an order that granted Plaintiff's IFP application, and—after reviewing the Complaint pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A—permitted the action to go forward with respect to Plaintiff's claim of failure to intervene against Defendant. (Dkt. No. 10.) In his decision granting Plaintiff's IFP application, Judge Kahn found that, as of the date Plaintiff signed his Complaint, at least three of his prior

actions and appeals had been dismissed as frivolous and/or failure to state a claim upon which

relied may be granted.[1]  (Dkt. No. 10 at 3.)  Nonetheless, Judge Kahn concluded that—based on

the allegations in the Complaint—Plaintiff qualified for the imminent danger exception under the

three strikes provision of section 1915(g).  (*Id*. at 3-6.)  In addition, the Court noted that this was

a "preliminary finding," and advised that Plaintiff's IFP status would be revoked should it later

be determined that he was not in fact in imminent danger of serious physical injury at the time

the action was commenced.  (*Id*.)

On September 22, 2020, Plaintiff filed a motion for reconsideration of Judge Kahn's

Order dated September 8, 2020.  (Dkt. No. 14.)  On October 2, 2020, Judge Kahn denied

Plaintiff's motion for reconsideration.  (Dkt. No. 15.)

On August 2, 2021, the discovery deadline expired and no motion has been made to

extend it.  (Dkt. No. 32; *see generally* docket sheet.)  On August 18, 2021, Plaintiff paid the

$350.00 filing fee in full.  (*See* docket entry dated 8/18/2021.)

On September 27, 2021, Defendant filed this motion for summary judgement.  (Dkt. No.

33.)  On October 8, 2021, Plaintiff filed a response in opposition to the motion for summary

judgement.  (Dkt. No. 36.)

---

[1]      Judge Kahn based this finding, in part, on an earlier conclusion by judges in the Southern
District of New York that Plaintiff had accumulated three strikes for purposes of section 1915(g).
(Dkt. No. 10 at 3, n.4 (citing *Elleby v. Nunez*, No. 16-CV-3675, Dkt. No. 16 (S.D.N.Y. Nov. 21,
2016) (denying Plaintiff's application to proceed IFP pursuant to 28 U.S.C. § 1915(g) because
Plaintiff had accumulated "three strikes" before commencing the action); *Elleby v. New York
State*, No. 16-CV-8342, Dkt. No. 3 (S.D.N.Y. Nov. 28, 2016) (same); *Elleby v. Nunaz*, No. 16-
CV-8341, Dkt. No. 2 (S.D.N.Y. Nov. 30, 2016) (same)).

C.    **Statement of Undisputed Material Facts**

Unless otherwise noted, the following facts were asserted and supported by Defendant in his Statement of Material Facts and not denied by Plaintiff in his response.  (*Compare* Dkt. No. 33, Attach. 1 [Def.'s Statement of Material Facts], *with* Dkt. No. 36 [Pl.'s Resp.].)

<u>Incident on June 15, 2020</u>

1.    In June of 2020, Defendant was the Sergeant at Greene responsible for maintaining the safety and security of multiple areas of the prison, including the north yard, programming, and the gym.

2.    Defendant was not responsible for the dormitories, including the N-2 dorm that Plaintiff was housed at the time of the incident on June 15, 2020.

3.    On June 2, 2020, Plaintiff was involved in a fight with another inmate in the N-2 dormitory bathroom.

4.    Following that incident, Plaintiff was offered protective custody status, but refused.

5.    Plaintiff was issued a misbehavior report for this incident and was found guilty of all charges following a hearing.

6.    Defendant had no involvement with the incident on June 2, 2020, the protective custody refusal, or the disciplinary proceeding that followed.

7.    Defendant swore under penalty of perjury that, at the time of his involvement of in the incident on June 15, 2020, does not recall being aware of the incident on June 2, 2020.

8.    Plaintiff was moved from the N-2 dormitory to the I-2 dormitory on June 2, 2020.

9.    Plaintiff remained in the I-2 dormitory until June 14, 2020, when he was returned to the N-2 dormitory.

10. Defendant had no involvement with the decisions to move Plaintiff to the I-2 dormitory on June 2, 2020, or return him to the N-2 dormitory on June 14, 2020.

11. Defendant denies meeting or speaking with Plaintiff on or about June 14, 2020.

12. Defendant denies having any interactions with Plaintiff before the incident in the north yard on June 15, 2020.

13. On June 15, 2020, Defendant responded to a "Red Dot" in the north yard of Greene.

14. Defendant observed Plaintiff and another inmate in mechanical restraints and was informed by staff that the inmates had been fighting.

15. The other inmate involved had been housed in the J-2 dormitory before the incident.

16. At the time of the incident, the north yard had inmates from the north side of the facility, including inmates from the I-2, H-2, J-2, and N-2 dormitories.

17. After the incident, Plaintiff was escorted to the medical unit and seen by medical staff to treat his injuries.

18. Thereafter, Plaintiff was admitted to the SHU-200 by Lieutenant Petrie pending disciplinary action based on the incident.

19. Defendant conducted an investigation of the incident and determined that the fight occurred because the inmates belonged to rival unauthorized gangs within the facility.

20. On June 15, 2020, Defendant offered protective custody to Plaintiff, which he refused.

21. On June 16, 2020, Sergeant Galioto interviewed Plaintiff regarding the incident and made a recommendation—dated June 21, 2020—that Plaintiff be placed in Involuntary

Protective Custody ("IPC") based on the threat to his safety posed by other inmates due to his participation in an unauthorized gang organization.

22.    On June 21, 2020, Plaintiff was moved from the SHU-200 to the Greene SHU, pending an IPC hearing as required by Directive.

23.    On June 23, 2020, Lieutenant Petrie conducted a hearing and determined that Plaintiff should be placed in IPC due to risks to his safety posed by his participation in a gang organization.

24.    As a result of the IPC determination, Plaintiff remained housed in the Greene SHU.

25.    On July 27, 2020, Plaintiff was transferred from Greene to Washington.

26.    While housed in the Greene SHU-200 from June 15, 2020, through June 21, 2020, Plaintiff was confined pursuant to Directive #4933, which governs Special Housing Units.

27.    The Greene SHU-200 is a 100 double-cell unit.

28.    Each double-cell has an attached recreation pen to which, only the inmates housed in the cell have access.

29.    Pursuant to directive, inmates in the SHU-200 spend 23 hours each day in their cell with one hour of recreation time in the attached recreation pen.

30.    They eat their meals, shower, and receive all other services in or at their cell.

31.    Inmates have no physical interaction with other inmates other than their cellmate.

32.    Plaintiff was housed alone in a SHU-200 cell from June 15, 2020, through his transfer to SHU on June 21, 2020.

33.    When Sergeant Galioto recommended IPC for Plaintiff on June 21, 2020, Plaintiff was moved from the Greene SHU-200 to the Greene SHU.

34.     The Greene SHU is a 15 single-cell unit in which, each inmate is housed alone in a cell.

35.     Inmates in the SHU spend twenty-three hours per day in their cell and have one hour of recreation.

36.     For recreation, inmates are escorted from their cell to a separate area that contains recreation pens.

37.     Only one inmate occupies each recreation pen.  Inmates have no physical interaction with other inmates while in the Greene SHU or the recreation pens.

38.     While Plaintiff was housed in the SHU-200 from June 15, 2020, to June 21, 2020, and housed in the SHU from June 21, 2020, to July 27, 2020, he was housed under conditions that prohibited other inmates coming into contact with him and threatening his safety by assault or other means.

39.     During this period, Plaintiff was never assaulted by another inmate, or otherwise injured or harmed in any way.

40.     During this period, Plaintiff did not alert staff to any specific threats to his safety.

41.     Following Defendant's investigation of the incident on June 15, 2020, Defendant had no further interactions with Plaintiff aside from testifying at a disciplinary hearing concerning the incident.

<u>Exhaustion of Administrative Remedies</u>

42.     Thomas Mauro is employed by the New York State Department of Corrections and Community Supervision ("DOCCS"), and since February 2016, has worked as the Greene Inmate Grievance Program ("IGP") Supervisor ("IGPS").

43.     The IGP at DOCCS facilities is provided for in Part 701 of Title 7 of the Official

Compilation of Codes, Rules and Regulations of the State of New York ("N.Y.C.R.R.").  The

grievance process is also described in detail in DOCCS' Directive #4040.  At Greene,

N.Y.C.R.R. Title 7 and Directive #4040 are available in the facility's law library.  In addition,

inmates arriving at Greene go through an inmate orientation program that includes a presentation

about the grievance process with instruction on how to file a grievance and appeal a grievance.

Inmates also receive an orientation manual with guidance concerning the grievance program.

44.     Greene has a fully functioning grievance program consistent with DOCCS'

regulations.

45.     To start the grievance process, the inmate sends a written complaint to the

grievance office at Greene.  Inmates may send a grievance to the grievance office via

correspondence (*i.e.*, facility mail) or fill out a grievance while sitting in the grievance office.

Correspondence is checked daily.  Additionally, when an inmate is in any special housing unit

(*e.g.*, "SHU"), weekly rounds are conducted to give the inmate access to the grievance program,

including the opportunity to pose questions about a pending grievance or appeal.  A grievance

complaint may be written on a grievance form available to inmates at Greene, or on regular

paper.  To be timely, a grievance must be filed with the grievance office within twenty-one (21)

calendar days of the alleged incident that the inmate seeks to grieve.  However, an inmate may

request to file a late grievance within forty-five (45) calendar days.

46.     Once a grievance is determined to be timely, it is logged, coded, and titled.  An

investigative request is sent to investigate the inmate's claims.  After the investigative report is

returned, a grievance hearing is conducted by the Inmate Grievance Review Committee

("IGRC").  Within two (2) days following the hearing, the IGRC's determination is logged and

forwarded to the inmate, who is advised that he may appeal within seven (7) calendar days to the Superintendent.

47.     Upon issuance of the Superintendent's response, an inmate who is not satisfied must appeal to the Central Office Review Committee ("CORC"), the third and final step under DOCCS' Inmate Grievance Program.

48.     In certain cases, the IGRC may dismiss a grievance rather than render a determination.  Among other bases for dismissal, the IGRC may dismiss a grievance if it finds that the grievant will not be personally affected by the issue in the complaint.  A dismissal may not be appealed to the Superintendent or CORC.  If a grievant believes that a dismissal was not authorized, the grievant may apply directly to the facility IGPS within seven calendar days of receipt of the IGRC's dismissal to reopen the grievance.  The IGPS may return the grievance to the IGRC for a hearing and recommendation, or deny the application.  If the application is denied, the grievant may file a separate grievance to contest the IGPS's denial.  The separately-filed grievance would then follow the same three-step process outlined above, including appeals to the Superintendent and CORC if the separately-filed grievance is denied.  If the separately-filed grievance is granted at any stage, the original grievance will be reopened for a hearing and decision by the IGRC, and if the IGRC denies the original grievance, the grievant must appeal to the Superintendent and CORC as outline above.  Accordingly, in order to fully exhaust administrative remedies following the dismissal of a grievance pursuant to 7 N.Y.C.R.R. 701.5(b)(4)(i)(b), the grievant must apply to the IGPS to reopen the grievance, and if the application is denied, file a separate grievance concerning the denial and thereafter follow the three-step process outlined above.

49.    Plaintiff's allegations in this matter are appropriate subject matter for the grievance process.

50.    Plaintiff filed one grievance between June 1, 2020, and his transfer from Greene to Washington Correctional Facility on July 27, 2020.

51.    No additional grievances were filed at Greene following Plaintiff's departure on July 27, 2020.

52.    On July 1, 2020, grievance # GNE-0228-20 was filed and logged by the IGRC Clerk at Greene.

53.    In grievance GNE-0228-20, Plaintiff claimed that he was assaulted in the north yard on June 15, 2020, and that he was held in Special Housing because he had to protect himself since there was no security at the time of the incident.

54.    Following an investigation, the IGRC dismissed the grievance # GNE-0228-20 on July 30, 2020, because of Plaintiff's transfer to another facility pursuant to 7 NYCRR §§ 701.5(b)(4)(i)(b), 701.3(b).

55.    The dismissal informed Plaintiff that if he did not feel dismissal was authorized, he could apply to the IGPS for review within seven days after receipt of the IGRC's decision to dismiss.

56.    Because Plaintiff had transferred to Washington at the time of the IGRC's dismissal, the dismissal was sent to Plaintiff at his new facility.

57.    Plaintiff did not apply to the IGPS at Greene for reconsideration of the dismissal of his grievance.

58.    Plaintiff has never appealed a grievance to CORC, including GNE-0228-20 or any grievance contesting the dismissal of GNE-0228-20.

D.    **Parties' Briefing on Defendant's Motion for Summary Judgment**

1.    **Defendant's Memorandum of Law**

Generally, in support of his motion for summary judgment, Defendant asserts the following four arguments: (1) Plaintiff was not under a threat of imminent danger at the time he filed the Complaint and thus, his IFP status should be revoked; (2) Plaintiff failed to exhaust his administrative remedies; (3) Plaintiff cannot establish a failure-to-protect claim pursuant to the Eighth Amendment; and (4) Defendant is entitled to qualified immunity. (Dkt. No. 33, Attach. 6 [Def.'s Mem. of Law].)

First, Defendant argues that on June 17, 2020—the date that Plaintiff filed the Complaint pursuant to the prison mailbox rule—Plaintiff was under no threat of assault from other inmates. (*Id*. at 10-13.) Defendant asserts that after the incident on June 15, 2020, Plaintiff was immediately taken to the medical unit for an exam then moved to the Green SHU-200, where he was housed alone until June 21, 2020. (*Id*.) Defendant argues that Plaintiff was moved on June 21, 2020, to the Green SHU, where he remained until July 27, 2020, when he was transferred to Washington. (*Id*.) Defendant argues that, thus, from June 15, 2020, through July 27, 2020, Plaintiff was housed under conditions that prevented other inmates from assaulting or otherwise threatening his safety. (*Id*.) As a result, Defendant argues that Plaintiff's IFP status—which was preliminarily granted based on the imminent danger exception to the three strikes rule—should be revoked and the Complaint conditionally dismissed because Plaintiff was not subject to imminent danger at the time the Complaint was filed. (*Id*.)

Second, Defendant argues that Plaintiff filed one grievance concerning the incident in the north yard on June 15, 2020, which was closed by the IGRC because of Plaintiff's transfer to Washington. (*Id*. at 13-16.) Defendant argues that the IGP office did not receive an application

from Plaintiff to reconsider the dismissal, Plaintiff did not submit any further correspondence regarding the grievance, and Plaintiff did not file any other grievances at Greene before his transfer to Washington. (*Id.*) Therefore, Defendant argues that Plaintiff failed to exhaust his administrative remedies. (*Id.*) Moreover, Defendant argues that Plaintiff filed this action on June 17, 2020—just two days after the alleged assault—only one day after he dated his grievance and thus, he could not have exhausted his administrative remedies in that time. (*Id.*)

Third, Defendant argues that even accepting Plaintiff's allegations as true, he cannot establish the objective or subjective prongs of his failure-to-protect claim against Defendant. (*Id.* at 16-20.) More specifically, Defendant argues that there is no causal connection between Plaintiff's transfer to the N-2 dormitory and the incident on June 15, 2020, because the inmate with whom Plaintiff fought was housed in the J-2 dormitory and the incident occurred in the north yard at a time when the inmates from the north side of the facility—including the I-2, J-2, and N-2 dormitories—congregate. (*Id.*) As a result, Defendant argues that Plaintiff cannot establish the objective prong because even if he had remained in the I-2 dormitory (and not been transferred back to the N-2 dormitory), he still would have come into contact with the inmate from the J-2 dormitory. (*Id.*) Moreover, Defendant argues that with respect to the subjective element, there is no evidence that Plaintiff informed Defendant of any specific threat to his safety from which Defendant could have drawn an inference that Plaintiff was at risk of being assaulted by an inmate from the J-2 dormitory in the north yard or that returning Plaintiff to the N-2 dormitory posed a risk to Plaintiff's safety. (*Id.*) Defendant argues that Plaintiff's vague concern that it would be unsafe for him to speak with inmates in the H-2 dormitory, amounts to nothing more than a general fear of assault from other inmates, which is insufficient to satisfy the subjective prong. (*Id.*)

Fourth, Defendant argues that he is entitled to qualified immunity because a reasonable official would not have comprehended that he was violating any of Plaintiff's constitutional rights. (*Id*. at 20-21.) In addition, Defendant argues that no existing precedent demonstrates that placing an inmate in a particular dormitory after being informed that he is no longer a gang member violates the inmate's Eighth Amendment constitutional rights. (*Id*.)

### 2. Plaintiff's Opposition

Generally, in opposition to Defendant's motion for summary judgment, Plaintiff asserts the following five arguments: (1) he has not had the opportunity to conduct his full discovery and is still seeking the I-2 officers log book to establish that Defendant called Plaintiff out of the I-2 dorm on June 14, 2020; (2) he refused protective custody on June 2, 2020, because he did not think it was necessary at that time and was only offered protective custody on June 15, 2020, after the incident; (3) he attempted to exhaust his administrative remedies but was transferred to Washington and the grievance was dismissed on July 30, 2020, after the transfer; (4) the Court should allow the case to continue in the interests of justice because there are several outstanding discovery issues; and (5) Defendant was involved in the handling of Plaintiff's grievance, which reflects a conflict of interest. (Dkt. No. 36 [Pl.'s Opp'n].)

## II. RELEVANT LEGAL STANDARDS

### A. Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).[2]  As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[3]  (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[4]  As has often been recognized by both

---

[2]      As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted).  As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[3]      *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[4]      *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[5]

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1. What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[6]–even when the non-movant was proceeding *pro se*.[7]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local

---

[5]    *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

[6]    Among other things, Local Rule 56.1 (previously Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1.

[7]    *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

Rule 7.1(a)(3).[8]  Stated another way, when a non-movant fails to oppose a legal argument

asserted by a movant, the movant may succeed on the argument by showing that the argument

possesses facial merit, which has appropriately been characterized as a "modest" burden.  *See*

N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined

that the moving party has met its burden to demonstrate entitlement to the relief requested therein

. . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30,

2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at

*2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B.    Standard Governing Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with

respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted."  42

U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016) ("The [PLRA]

mandates that an inmate exhaust 'such administrative remedies as are available' before bringing

suit to challenge prison conditions.").  "[T]he PLRA's exhaustion requirement applies to all

inmate suits about prison life, whether they involve general circumstances or particular episodes,

and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516,

---

[8]        *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31
(N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to
oppose several arguments by defendants in their motion for summary judgment as consent by
plaintiff to the granting of summary judgment for defendants with regard to the claims that the
arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v.
Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004)
(McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude
expert testimony as "a concession by plaintiff that the court should exclude [the expert's]
testimony" on that ground).

532 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "'using all steps that the [government] agency holds out, and doing so properly'" (quoting *Woodford*, 548 U.S. at 90)). In New York State prisons, DOCCS has a well-established three-step IGP. 7 N.Y.C.R.R. § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

Grievances claiming employee harassment, including claims of excessive force, "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent. *Id.* § 701.8; *see, e.g., Torres v. Carry*, 691 F. Supp. 2d 366 (S.D.N.Y. 2009) (Section 701.8 has been found applicable to claims of excessive force.). The superintendent is required to initiate an in-house investigation by higher-ranking supervisory personnel; request an investigation by the Inspector General's office; or request an investigation by the New York State Police Bureau of Investigation if the superintendent determines that criminal activity may be involved. 7 N.Y.C.R.R. § 701.8(d).

A grievance referred to the superintendent and determined to be an allegation of harassment may not be withdrawn and must be addressed by the superintendent. *Id.* The superintendent is required to render a decision on the grievance within twenty-five calendar days, and extensions may be granted only with the consent of the grievant. *Id.* § 701.8(f). If the superintendent fails to respond within the required twenty-five days, the grievant may appeal the grievance to CORC by "filing a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g). If the grievant wishes to appeal the superintendent's response to CORC, he must do so within seven calendar days of receipt of that response. *Id.* § 701.8(h).

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cnty. of Orange*, 467 F.3d

170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).") (quotations marks and citations omitted).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (quotation marks and citations omitted). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The

illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *Mena v. City of New York*, 13-CV-2430, 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, the defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216. The plaintiff must then establish the IGP grievance procedure was unavailable to him under *Ross*. *Id.*

## III.    ANALYSIS

### A.    Plaintiff's IFP Status

After carefully considering the matter, I recommend that the Court deny Defendant's motion to revoke Plaintiff's IFP status as moot. Assuming *arguendo* that Plaintiff was not subject to imminent danger at the time that he filed the Complaint, and thus, that his IFP status should be revoked, he would be granted leave to pay the filing fee, which he has already done. (*See generally* docket entry dated 8/18/2021.) As a result, I find that Defendant's motion on this basis is moot and recommend that it be denied.

### B.    Exhaustion of Administrative Remedies

After carefully considering the matter, I recommend that the Complaint be dismissed because Plaintiff failed to exhaust his administrative remedies, for the reasons stated in Defendant's memorandum of law. (Dkt. No. 33, Attach. 6.) To those reasons, the Court adds the following analysis, which is intended to supplement, but not supplant, those reasons.

Defendant has met his burden of establishing that no genuine issue of material fact exists concerning Plaintiff's failure to exhaust his administrative remedies with respect to the incident on June 15, 2020. The sworn declaration of Thomas Mauro and accompanying exhibit made clear that the Greene IGP did not receive an application from Plaintiff for review of the dismissal

of his grievance. (Dkt. No. 33, Attach. 4 at ¶ 17.) In addition, Plaintiff appears to concede that he did not seek review of the dismissal of his grievance. (Dkt. No. 36 at 4 ["The Defense is running the Court in Circles with saying I grieved the matter but failed to exhaust after I was already hurt and transferred."].) Moreover, the sworn declaration of Rachael Seguin and accompanying exhibit makes clear that CORC has no record of Plaintiff appealing any grievance related to the incident on June 15, 2020. (Dkt. No. 33, Attach. 5.)

Indeed, as Defendant asserts, it is implausible that Plaintiff was able to exhaust his administrative remedies before commencing this action merely two days after the subject incident. *See Meggison v. Champlin*, 20-CV-0436, 2021 WL 768139, at * (N.D.N.Y. Feb. 9, 2021) (Lovric, M.J.) (holding that where the plaintiff filed the federal action "ten days after the alleged incident and seven days after he allegedly filed the grievance" it was "implausible that [the p]laintiff was able to exhaust his administrative remedies before commencing [the] action."), *report and recommendation adopted by* 2021 WL 765725 (N.D.N.Y. Feb. 26, 2021) (Sharpe, J.); *Cohen v. Welch*, 16-CV-0593, 2017 WL 3311244, at *5-6 (N.D.N.Y. July 11, 2017) (Dancks, M.J.) (collecting cases) (holding that where the plaintiff filed the federal action one day after the alleged incident "it is implausible that [p]laintiff was able to exhaust his administrative remedies before commencing this action" and that the "[p]laintiff's claim that his grievances were never answered does not excuse his failure to exhaust" because "a prisoner must proceed through all three levels of the [inmate grievance process] to satisfy the PLRA's exhaustion requirement."), *report and recommendation adopted by* 2017 WL 3309713 (N.D.N.Y. Aug. 2, 2017) (Scullin, J.).

As a result, I recommend that Plaintiff's Complaint be dismissed for failure to exhaust his administrative remedies.

C.      **Establishment of an Eighth Amendment Failure-to-Protect Claim**

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 831 (1994)). This requirement includes a general "duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833.

However, not "every injury suffered by [a] prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Prison officials can be held responsible for such harms only if they act with "deliberate indifference" to inmate safety. *Hayes*, 84 F.3d at 620. The test for establishing deliberate indifference to inmate safety has an objective component and subjective component. First, under the objective prong, a plaintiff must show that he was "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Second, under the subjective prong, a plaintiff must establish that the prison official acted with a "sufficiently culpable state of mind." *Id*.

To evaluate culpability under an Eighth Amendment deliberate indifference framework, a prison official must know that the plaintiff "face[d] a substantial risk of harm and he disregard[ed] that risk by failing to take reasonable measures to abate the harm." *Hayes*, 84 F.3d at 620 (citing *Farmer*, 511 U.S. at 842, 845). The prison official need not be "aware[ ] of the specific risk to the plaintiff or from the assailant." *Warren v. Goord*, 579 F. Supp. 2d 488, 495 (S.D.N.Y. 2008). Rather, the risk may come from a "single source or multiple sources" and may be a risk that all prisoners in the plaintiff's position face. *Warren*, 579 F. Supp. 2d at 495 (quoting *Farmer*, 511 U.S. at 843).

As set forth in Defendant's memorandum of law, Plaintiff cannot demonstrate that he suffered any injury as a result of returning to the N-2 dormitory—because regardless of whether he was housed in the I-2 or N-2 dormitory, he would have come into contact with the other inmate in the north yard on June 15, 2020—and thus cannot satisfy the objective prong.  (Dkt. No. 33, Attach. 6 at 16-20.)  As a result, in the alternative, I recommend that Plaintiff's Complaint be dismissed because he cannot establish an Eighth Amendment failure to protect claim.

### D.    Qualified Immunity

Qualified immunity generally protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Aiken v. Nixon*, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), *aff'd* 80 F. App'x 146 (2d. Cir. 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991); *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir. 1990) (internal citation omitted).  A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether constitutional rights were clearly established at the time of the alleged violation.  *Aiken*, 236 F. Supp. 2d at 230.  "To determine whether a right was clearly established, [courts] 'generally look to Supreme Court and

Second Circuit precedent existing at the time of the alleged violation.'" *Bacon v. Phelps*, 961 F.3d 533, 545 (2d Cir. 2020) (citation omitted).

Defendant argues that he is entitled to qualified immunity.  However, to the extent Defendant applies the law of qualified immunity to Plaintiff's failure to protect claim, he only repeats arguments from elsewhere in his brief. (*See* Dkt. No. 33, Attach. 6 (arguing that, "As set forth above, Defendant did not violate any of Plaintiff's constitutional rights and the second prong of the qualified immunity inquiry need not be reached.").)  Defendant has not identified any ambiguity in the applicable legal standard.  *Cf. Deskovic v. Peekskill*, 894 F. Supp. 2d 443, 467 (S.D.N.Y. 2012) (denying a qualified immunity application where the defendant "ha[d] not identified any changes in the legal standards").  Nor is the law regarding failure to protect inmates unsettled or unclear.  *See Farmer*, 511 U.S. at 834 (describing the requirements for an Eighth Amendment failure to protect claim); *Lewis v. Siwicki*, 944 F.3d 427, 430-31 (2d Cir. 2019) (same).  Thus, to the extent that the Court rejects the above recommendations—that Plaintiff's Complaint be dismissed for failure to exhaust his administrative remedies or, in the alternative, for failure to establish a failure to protect claim pursuant to the Eighth Amendment— I recommend that Defendant's qualified immunity argument be denied.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendant's motion for summary judgement (Dkt. No. 33) be **GRANTED** in so far as it seeks dismissal of Plaintiff's Complaint (Dkt. No. 1) for failure to exhaust his administrative remedies and, in the alternative, for failure to establish a failure to protect claim pursuant to the Eighth Amendment; and it is further respectfully,

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be **DISMISSED WITH PREJUDICE** for failure to exhaust administrative remedies and, in the alternative, for failure to establish a failure to protect claim pursuant to the Eighth Amendment; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[9]

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:  November 30 , 2021
        Binghamton, New York


Miroslav Lovric
U.S. Magistrate Judge

---

[9]     The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).